1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Bradley S. Keller, WSBA #10665
Ralph E. Cromwell, Jr., WSBA #11784
Jofrey M. McWilliam, WSBA #28441
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000
Facsimile No.: (206) 622-2522

Attorneys for Perkins Coie LLP
and Lowell Ness

The Honorable Stanley A. Bastian

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JUN DAM, individually and on behalf of
all others similarly situated,

                                    Plaintiff,

        vs.

PERKINS COIE, LLP, a Washington
limited liability partnership; PERKINS
COIE I, P.C., a Washington corporation
registered in California; PERKINS COIE
CALIFORNIA, P.C., a California
corporation; PERKINS COIE
CALIFORNIA II, P.C., a California
corporation, and LOWELL NESS,
individually,

                                    Defendants.

No. 2:20-CV-00464

**CLASS ACTION**

**DECLARATION OF RALPH E.
CROMWELL, JR. IN SUPPORT
OF MOTION TO COMPEL
ARBITRATION AND STAY**

DECLARATION OF RALPH E. CROMWELL, JR. IN SUPPORT
OF MOTION TO COMPEL ARBITRATION AND STAY - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1
2
3

Ralph E. Cromwell, Jr., declares as follows:

4        1.      I am an attorney licensed to practice law in Washington.  I am one of the

5    attorneys representing defendants Perkins Coie LLP and Lowell Ness in this matter.  I

6    have personal knowledge of the following.

7        2.      When the Trustee in the related adversary proceeding in the bankruptcy

8    of Giga Watt, Inc. ("GW Wenatchee") issued a subpoena to Perkins last summer, I

9    was the attorney principally responsible for reviewing Perkins' files to locate

10   responsive, non-privileged documents.  One of the document requests issued by the

11   Trustee asked for any agreements regarding an escrow.  In reviewing Perkins' file, I

12   did not find any conventional escrow agreement regarding the sale of tokens by Giga

13   Watt Pte. Ltd ("GW Singapore").  That is to say, I did not locate any contractual

14   document, to which Perkins was a party, which mentioned an escrow or which gave

15   directions regarding the operation of an escrow relating to the sale and purchase of the

16   tokens at issue in this matter.  I did locate one or two emails which referenced placing

17   the proceeds of token sales into Perkins' IOLTA account as being an "escrow" which

18   were produced to the Trustee.  In addition to the responsive, non-privileged

19   documents, Perkins also produced an Excel spreadsheet showing all money in and out

20   of its account and some 4,500 pages of emails relating largely to the administration of

21   funds in the IOLTA account.  These same documents were provided to plaintiff's

22   counsel in this matter as part of Perkins' "lay down" initial disclosures in this matter.

23
24
25
26

DECLARATION OF RALPH E. CROMWELL, JR. IN SUPPORT
OF MOTION TO COMPEL ARBITRATION AND STAY - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

3.    Attached hereto as Exhibit 1 is a true and correct copy of an email which I sent to the Trustee's counsel on September 15, 2020.  Attached to that email is an email dated May 17, 2017, forwarding a "WTT Purchase Agreement" which my office partially redacted.  These documents have also been produced to plaintiff in this matter.

4.    Attached hereto as Exhibit 2 is a true and correct copy of an unredacted version of the "WTT Purchase Agreement," which was attached to the May 17, 2017, email referenced in paragraph 3.

5.    Attached hereto as Exhibit 3 is a true and correct copy of an email which I received from the Trustee's counsel on September 9, 2020, attaching a copy of a "WTT Token Purchase Agreement" executed by Scott Glasscock.  In reviewing Perkins' files, I found no indication that Perkins had ever received or reviewed the version of the "WTT Token Purchase Agreement" attached to this email.

6.    Attached hereto as Exhibit 4 is a true and correct copy of the May 2017 Giga Watt Token Launch White Paper.

7.    For ease of reference, attached hereto as Exhibit 5 is a true and correct copy of a letter dated August 2, 2018, from S. Jensen to the U.S. Securities and Exchange Commission. I have not included the exhibits to the letter which are extensive and not relevant.

DECLARATION OF RALPH E. CROMWELL, JR. IN SUPPORT
OF MOTION TO COMPEL ARBITRATION AND STAY - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

8.    For ease of reference, attached hereto as Exhibit 6 is a true and correct copy of Claim 365 filed by Giga Watt Pte. Ltd. ("GW Singapore") in the bankruptcy of GW Wenatchee.

9.    Attached here to as Exhibit 7 is a true and correct copy of Giga Watt PTE Ltd.'s Certificate of Incorporation.

DATED this 11th day of June, 2021.

BYRNES KELLER CROMWELL LLP

By /s/ Ralph E. Cromwell, Jr.
     Ralph E. Cromwell, Jr., WSBA #11784
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
206-622-2000
Fax:  206-622-2522
Email:  rcromwell@byrneskeller.com

DECLARATION OF RALPH E. CROMWELL, JR. IN SUPPORT
OF MOTION TO COMPEL ARBITRATION AND STAY - 4

Byrnes ◆ Keller ◆ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.  The NEF for the foregoing specifically identifies recipients of electronic notice.

By /s/ Ralph E. Cromwell, Jr.
      Ralph E. Cromwell, Jr.
*Attorneys for Plaintiffs*
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
206-622-2000
Fax:  206-622-2522
Email:  rcromwell@byrneskeller.com

DECLARATION OF RALPH E. CROMWELL, JR. IN SUPPORT
OF MOTION TO COMPEL ARBITRATION AND STAY - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

# EXHIBIT 1

| | |
|---|---|
| **From:** | Ralph Cromwell |
| **Sent:** | Tuesday, September 15, 2020 10:25 AM |
| **To:** | Pamela M. Egan |
| **Subject:** | FW: GigaWatt - Perkins Additional Document |
| **Attachments:** | PC_004526-PC_004527.pdf |

**From:** Mika Kitamura
**Sent:** Tuesday, September 15, 2020 9:00 AM
**To:** Ralph Cromwell
**Subject:** GigaWatt - Perkins Additional Document

Attached is an additional email produced by Perkins Coie. (Doc. Nos. PC4526-27).

**Mika L. Kitamura, Paralegal Manager**
BYRNES KELLER CROMWELL LLP
1000 Second Avenue Suite 3800 | Seattle Washington 98104
Tel 206.622.2000 | Fax 206.622.2522
mkitamura@byrneskeller.com | www.byrneskeller.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please immediately e-mail the sender at mkitamura@byrneskeller.com and destroy all copies.

| | |
|---|---|
| **From:** | Katrina Grant <katrina@cryptonomos.com> |
| **Sent:** | Wednesday, May 17, 2017 1:14 PM |
| **To:** | Ness, Lowell D. (PAO) |
| **Subject:** | Review of the White Paper and Token Purchase Agreement |
| **Attachments:** | Form of Token Purchase Agreement-WTT-auto.docx; GigaWattWhitePaper964-revised_7.docx |

Lowell, attached is the final version of White Paper and a Token Purchase Agreement that would be incorporated into the web-site, so every purchaser would click "Accept" button before making payment.

Could you please review both documents and let me know if it works.

We are starting presale on the 19th and we should publish White Paper by the end of the day tomorrow. I would greatly appreciate your prompt response.

Sincerely,
Katrina

1

PC 004526

<u>**WTT PURCHASE AGREEMENT**</u>

  This WTT Purchase Agreement (this "<u>Agreement</u>") is made by and between GigaWatt Pte. Ltd., a Singapore company (the "<u>Company</u>"), and you ("<u>Purchaser</u>") on [Date].

# REDACTED

  1. **<u>Sale of WTT</u>.** Subject to the terms and conditions of this Agreement, simultaneously with the acceptance of this Agreement by Purchaser (the "<u>Purchase Date</u>"), the Company is hereby selling to Purchaser, and Purchaser is purchasing from the Company, [Number of Tokens] of Giga Watt Project tokens (the Giga Watt Project tokens purchased hereunder are referred to as the "WTT Tokens") at a purchase price of $[Price Paid] per WTT Tokens (the aggregate purchase price paid for the WTT Tokens is referred to as the "<u>Aggregate Purchase Price</u>").  The Aggregate Purchase Price shall be paid in full by the Purchaser on the Purchase Date.

  2. **<u>Cryptonomos.</u>** Sale of the WTT Tokens is conducted only through the platform Cryptonomos "Cryptonoms"), where the Purchaser shall register his/her/it account, in order to purchase WTT Tokens.

  3. **<u>Escrow.</u>** Funds collected from the Purchaser will be deposited to the escrow account held in Trust by Perkins Coie until the WTT Tokens are issued to the Purchaser. All funds paid in BTC or ETH will be converted to the U.S. dollars based on the exchange rate at any time of conversion within 24 hours from the time of purchase.

# REDACTED

PC  004527

# EXHIBIT 2

## WTT PURCHASE AGREEMENT

This WTT Purchase Agreement (this "Agreement") is made by and between GigaWatt Pte. Ltd., a Singapore company (the "Company"), and you ("Purchaser") on [Date].

*[DEV NOTE: The website will need to capture the date, number of tokens purchased and price paid and store the information in a database in a way that can match that data to this agreement with the rest of the terms of sale.]*

1.    **Sale of WTT.**    Subject to the terms and conditions of this Agreement, simultaneously with the acceptance of this Agreement by Purchaser (the "Purchase Date"), the Company is hereby selling to Purchaser, and Purchaser is purchasing from the Company, [Number of Tokens] of Giga Watt Project tokens (the Giga Watt Project tokens purchased hereunder are referred to as the "WTT Tokens") at a purchase price of $[Price Paid] per WTT Tokens (the aggregate purchase price paid for the WTT Tokens is referred to as the "Aggregate Purchase Price").    The Aggregate Purchase Price shall be paid in full by the Purchaser on the Purchase Date.

2.    **Cryptonomos.** Sale of the WTT Tokens is conducted only through the platform Cryptonomos "Cryptonoms"), where the Purchaser shall register his/her/it account, in order to purchase WTT Tokens.

3.    **Escrow.** Funds collected from the Purchaser will be deposited to the escrow account held in Trust by Perkins Coie until the WTT Tokens are issued to the Purchaser. All funds paid in BTC or ETH will be converted to the U.S. dollars based on the exchange rate at any time of conversion within 24 hours from the time of purchase.

4.    **Date of Issue.** Company will issue and transfer the WTT Tokens to Purchaser's account on the Giga Watt website http://giga-watt.com when the facilities become available in the order the Purchase Price was paid by the Purchaser.

5.    **Terms and Conditions of WTT Token.**  The WTT Token terms and conditions are as set forth in the White Paper located at http://_____.com.

6.    **Purchase and Taxation Representations.**  In connection with the purchase of the WTT Tokens, Purchaser represents to the Company the following:

(a)    Purchaser is aware of the terms and conditions of the WTT Tokens and has acquired sufficient information about the WTT Tokens to reach an informed and knowledgeable decision to acquire the WTT Tokens.

(b)    Purchaser understands that the WTT Tokens have not been registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other country, including the securities laws of any jurisdiction in which Purchaser is resident.

(c)    Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the WTT Tokens or any use of this

Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the WTT Tokens, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the WTT Tokens.

(d)    Purchaser's subscription and payment for and continued beneficial ownership of the WTT Tokens will not violate any applicable laws of Purchaser's jurisdiction.

(e)    Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the WTT Tokens. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the WTT Tokens and that Purchaser is not relying on the Company for any tax advice.

7.    **Compliance.**

(a)    **OFAC Compliance.** Due to the fact that hosting of the WTT Token Holders' equipment is performed by the U.S. based company Giga Watt, Inc., each Purchaser who wishes to use his/her/its WTT Tokens to host equipment would require to pass the OFAC compliance prior to hosting his/her/its equipment with Giga Watt, Inc. Purchaser who is on the OFAC lists would be denied services as required by the U.S. law.

(b)    **Compliance with other laws and regulations.** Company may be required to disclose the information about the Purchaser to the authorities under the laws of various countries, including the United States. Purchaser agrees to have his/her/its information provided to the legal authorities and law enforcement agencies, if Company is requested to do so.

8.    <u>**Miscellaneous.**</u>

(a)    <u>**Governing Law.**</u>    The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of Singapore, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the Singapore. Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("SIAC") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The seat of the arbitration shall be Singapore. The Tribunal shall consist of 3 arbitrator(s). The language of the arbitration shall be English.

(b)    <u>**Entire Agreement.**</u>    This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c)    **Amendments and Waivers.**  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.  No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)    **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this Agreement.  No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)    **Execution of this Agreement.** By checking the acceptance box at the time of Purchase, you deem to execute this Agreement and fully accept and agree to its terms and conditions.

# EXHIBIT 3

| | |
|---|---|
| **From:** | Pamela M. Egan <pegan@potomaclaw.com> |
| **Sent:** | Wednesday, September 9, 2020 12:54 PM |
| **To:** | Ralph Cromwell |
| **Subject:** | GW/AA/Perkins Coie |
| **Attachments:** | Exhibit E  - WTT Sales Contract.pdf |

FYI, see attached.

**Pamela M. Egan** | Partner | Potomac Law Group, PLLC
Tel: (415) 297-0132 | Fax: (202) 318-7707
pegan@potomaclaw.com | www.potomaclaw.com



*This e-mail and any attachments may contain information that is private, confidential, and/or privileged. If you are not the intended recipient, please notify us immediately and destroy all copies of this message and any attachments.*

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

# WTT TOKEN PURCHASE AGREEMENT

PLEASE READ THIS WTT TOKEN PURCHASE AGREEMENT CAREFULLY. NOTE THAT SECTION 15 CONTAINS A BINDING ARBITRATION CLAUSE AND REPRESENTATIVE ACTION WAIVER, WHICH AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THE TERMS OF THIS WTT TOKEN PURCHASE AGREEMENT, DO NOT PURCHASE TOKENS.

This WTT Purchase Agreement (this "Agreement") is made by and between GigaWatt Pte. Ltd., a Singapore company (the "Company"), an issuer of the WTT Tokens, and you, a user of the email address sg_personal@live.com ("Purchaser") on May 31, 2017.

1. **Sale of WTT.** Subject to the terms and conditions of this Agreement, simultaneously with the acceptance of this Agreement by Purchaser (the "Purchase Date"), the Company is hereby selling to Purchaser, and Purchaser is purchasing from the Company, 85,000 (eighty five thousand) of Giga Watt Project tokens ("WTT Tokens") at a purchase price of $85,000.00 (eighty five thousand US Dollars) per WTT Tokens ("Aggregate Purchase Price"). The Aggregate Purchase Price shall be paid in full by the Purchaser on the Purchase Date.

2. **Scope of Terms.**

(a) Unless otherwise stated herein, this Agreement governs only purchase of WTT Tokens from Company during pre-sale period from May 19, 2017 to June 2, 2017 (12 PM PDT).

(b) Any use of Tokens in connection with providing or receiving services through the Giga Watt project will be governed primarily by other applicable terms and policies, [which will be available at www.giga-watt.com upon the distribution of the first batch of WTT Tokens] (collectively, "Giga Watt Terms and Policies"). The Giga Watt Terms and Policies may change from time to time at the provider's sole discretion with the amended Giga Watt Terms and Policies posted instead of the previous version.

(c) To the extent of any conflict with this Agreement, the Giga Watt Terms and Policies shall control with respect to any issues relating to the use of WTT Tokens.

3. **Purchase Procedure.** Sale of the WTT Tokens is conducted only through the platform Cryptonomos ("Cryptonomos"), where the Purchaser would be able to see the purchased tokens in its personal account ("Cryptonomos Account"). Before June 2, 2017, Purchaser shall visit www.cryptonomos.com and create Cryptonomos Account with the same email provided by Purchaser in this Agreement above. Purchaser would have to verify the email address through the email correspondence, which would be sent by Cryptonomos team to the Purchaser. The purchased WTT Tokens would be placed into the Purchaser's Cryptonomos Account on June 2, 2017. The email addresses on the Cryptonomos Account must match the email account provided by Purchaser in this Agreement above, in order for the Purchaser to see the purchased WTT Tokens in the Cryptonomos Account. If Purchaser participating in pre-sale creates Cryptonomos Account on or after June 2, 2017, Purchaser would have to contact the Cryptonomos team at sales@cryptomonos.com to have the purchased WTT Tokens placed to the Cryptonomos Account.

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

4.      **Date of Issue.** The WTT Tokens will be issued in step with the construction of
the facilities on a first come first serve basis. Upon completion of the token launch ("Token
Launch"), on August 7, 2017, Cryptonomos will distribute the purchased WTT Tokens to the
Cryptonomos Account of the Purchaser provided that such tokens are in the first batch of WTT
Tokens for the capacity of the facilities built by the date of issue. Subsequent batches of WTT
Tokens will be issued upon completion of the new facilities. If a cap of 30,000,000 WTT tokens
sold is reached before the scheduled end of the Token Launch, Cryptonomos at its own
discretion may issue WTT Tokens ahead of the date set forth above to provide access to the
facilities built by that time.

5.      **Receipt of WTT Tokens.** Upon distribution of the WTT Tokens by
Cryptonomos, Purchaser will have options to use WTT Tokens through Giga Watt Project by
transferring WTT Tokens to the Purchaser's account at www.giga-watt.com ("Giga Watt
Account") or to transfer WTT Tokens outside of the Giga Watt Project. Purchaser shall be
responsible for implementing reasonable measures for securing the wallet, vault or other storage
mechanism Purchaser decides to use to receive and hold Tokens outside of the Giga Watt
Project, including any requisite private key(s) or other credentials necessary to access such
storage mechanism(s).  If Purchaser's private key(s) or other access credentials are lost,
Purchaser may lose access to the purchased WTT Tokens. Company shall not be responsible for
any such losses.

6.      **Terms and Conditions of WTT Tokens.**    The WTT Tokens terms and
conditions are as set forth in the White Paper attached as Exhibit A to this Agreement.

7.      **Cancellation; Refusal of Purchase Requests.**  The purchase of WTT Tokens
from Company is final, and there will be no refunds or cancellations except as provided in the
White Paper. Company reserves the right to refuse or cancel WTT Token purchase requests at
any time at the Company's sole discretion.

8.      **Acknowledgment and Assumption of Risks.**  Purchaser shall acknowledge and
agree that there are risks associated with purchasing WTT Tokens, holding WTT Tokens, and
using WTT Tokens, as disclosed in the White Paper.  For questions regarding these risks,
Purchaser shall contact the sales team at sales@cryptonomos.com.  BY PURCHASING WTT
TOKENS, PURCHSER EXPRESSLY ACKNOWLEDGES AND ASSUMES THESE RISKS.

9.      **Representations and Warranties.**  In connection with the purchase of the WTT
Tokens, Purchaser represents to the Company the following:

(a)     Purchaser is aware of the terms and conditions of the WTT Tokens and
has acquired sufficient information about the WTT Tokens to reach an informed and
knowledgeable decision to acquire the WTT Tokens.

(b)     Purchaser has sufficient understanding of cryptographic tokens, token
storage mechanisms (such as token wallets), and blockchain technology to understand this
Agreement and to appreciate the risks and implications of purchasing the WTT Tokens.

(c)     Purchaser understands that the WTT Tokens confer only the right to
access the facilities to host mining equipment at the lower hosting rate as described in the White

- 2 -

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

Paper, and confer no other rights of any form with respect to Giga Watt Project or the Company, including, but not limited to, any ownership, distribution, redemption, liquidation, proprietary (including all forms of intellectual property), or other financial or legal rights.

(d)     Purchaser shall not purchase WTT Tokens for any uses or purposes other than to use WTT Tokens as provided in the White Paper, including, but not limited to, any investment, speculative or other financial purposes.

(e)     Purchaser understands that the WTT Tokens are not digital currency, security, commodity or any other kind of financial instrument and have not been registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other country, including the securities laws of any jurisdiction in which Purchaser is resident.

(f)     Purchaser has satisfied itself as to the full observance of the laws of his/her/its jurisdiction in connection with any invitation to subscribe for the WTT Tokens or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the WTT Tokens, (ii) any foreign exchange restrictions applicable to such purchase, and (iii) any governmental or other consents that may need to be obtained.

(g)     Purchaser's subscription and payment for and continued beneficial ownership of the WTT Tokens will not violate any applicable laws of Purchaser's jurisdiction.

(h)     Purchaser shall comply with any applicable tax obligations in all relevant jurisdiction arising from the purchase of WTT Tokens.

(i)     If Purchaser is purchasing Tokens on behalf of any entity, he/she is authorized to accept the terms and conditions of this Agreement on such entity's behalf and that such entity will be responsible for breach of this Agreement by Purchaser or any other employee or agent of such entity (references to "Purchaser" in this Agreement refer to individual Purchaser and such entity, jointly).

10.     **Indemnification.**

(a)     To the fullest extent permitted by applicable law, Purchaser shall indemnify, defend and hold harmless the Company and the Company's respective past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the "Company Parties") from and against all claims, demands, actions, damages, losses, costs and expenses (including attorneys' fees) that arise from or relate to: (i) purchase or use of WTT Tokens, (ii) Purchaser's responsibilities or obligations under this Agreement, (iii) Purchaser's violation of this Agreement, or (iv) Purchaser's violation of any rights of any other person or entity.

(b)     The Company reserves the right to exercise sole control over the defense, at Purchaser's expense, of any claim subject to indemnification under Section 10(a).   This indemnity is in addition to, and not in lieu of, any other indemnities set forth in a written agreement between Purchaser and the Company.

- 3 -

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

11. **Disclaimers.**

(a)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE SPECIFIED IN A WRITING BY COMPANY, (A) THE WTT TOKENS ARE SOLD ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, AND COMPANY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES AS TO THE WTT TOKENS, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT; (B) COMPANY DOES NOT REPRESENT OR WARRANT THAT THE WTT TOKENS ARE RELIABLE, CURRENT OR ERROR-FREE, MEET PURCHASER'S REQUIREMENTS, OR THAT DEFECTS IN THE WTT TOKENS WILL BE CORRECTED; AND (C) COMPANY CANNOT AND DOES NOT REPRESENT OR WARRANT THAT THE WTT TOKENS OR THE DELIVERY MECHANISM FOR WTT TOKENS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

(b)    Some jurisdictions do not allow the exclusion of certain warranties or disclaimer of implied terms in contracts with consumers, so some or all of the exclusions of warranties and disclaimers in this Section may not apply to some Purchasers.

12. **Limitation of Liability.**

(a)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW: (i) IN NO EVENT WILL THE COMPANY OR ANY OF THE COMPANY PARTIES BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, WHERE RELATED TO LOSS OF REVENUE, INCOME OR PROFITS, LOSS OF USE OR DATA, OR DAMAGES FOR BUSINESS INTERRUPTION) ARISING OUT OF OR IN ANY WAY RELATED TO THE SALE OR USE OF THE WTT TOKENS OR OTHERWISE RELATED TO THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, WHETHER BASED IN CONTRACT, TORT (INCLUDING, BUT NOT LIMITED TO, SIMPLE NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), OR ANY OTHER LEGAL OR EQUITABLE THEORY (EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE); AND (ii) IN NO EVENT WILL THE AGGREGATE LIABILITY OF THE COMPANY AND THE COMPANY PARTIES (JOINTLY), WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), OR OTHER THEORY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THE WTT TOKENS, EXCEED THE AMOUNT PURCHASER PAYS TO COMPANY FOR THE WTT TOKENS.

(b)    THE LIMITATIONS SET FORTH IN SECTION 12(a) WILL NOT LIMIT OR EXCLUDE LIABILITY FOR THE GROSS NEGLIGENCE, FRAUD OR INTENTIONAL, WILLFUL OR RECKLESS MISCONDUCT OF THE COMPANY.

(c)    Some jurisdictions do not allow the limitation or exclusion of liability for incidental or consequential damages.  Accordingly, some of the limitations of this Section may not apply to some Purchasers.

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

13. **Release.** To the fullest extent permitted by applicable law, Purchaser releases the Company and the other Company Parties from responsibility, liability, claims, demands and/or damages (actual and consequential) of every kind and nature, known and unknown (including, but not limited to, claims of negligence), arising out of or related to disputes between users and the acts or omissions of third parties. Purchaser expressly waive any rights he/she/it may have under statute or common law principles that would otherwise limit the coverage of this release to include only those claims which Purchaser may know or suspect to exist in his/her/its favor at the time of agreeing to this release.

14. **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of Singapore, without giving effect to principles of conflicts of law.

15. **Dispute Resolution; Arbitration.**

PLEASE READ THE FOLLOWING SECTION CAREFULLY BECAUSE IT REQUIRES PURCHASER TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH THE COMPANY AND LIMITS THE MANNER IN WHICH PURCHASER CAN SEEK RELIEF FROM COMPANY.

(a) **Binding Arbitration.** Except for any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "Disputes") in which either Party seeks to bring an individual action in small claims tribunals or seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property, including, without limitation, copyrights, trademarks, trade names, logos, trade secrets or patents, Purchase and the Company (i) waive Purchaser's and the Company's respective rights to have any and all Disputes arising from or related to this Agreement resolved in a court, and (ii) waive Purchaser's and the Company's respective rights to a jury trial. Instead, Purchaser and the Company will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

(b) **No Class Arbitrations, Class Actions or Representative Actions.** Any Dispute arising out of or related to this Agreement is personal to Purchaser and the Company and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

(c) **Notice; Informal Dispute Resolution.** Each Party will notify the other Party in writing of any arbitrable or small claims Dispute within thirty (30) days of the date it arises, so that the Parties can attempt in good faith to resolve the Dispute informally. Notice to the Company shall be sent by e-mail to the support team at support@cryptonomos.com. Notice to Purchaser shall be sent to the email address provided by Purchaser in this Agreement. Purchaser's notice must include (i) Purchaser's name, postal address, email address and

- 5 -

about:bla

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that Purchaser is seeking.  If Purchaser and the Company cannot agree how to resolve the Dispute within thirty (30) days after the date notice is received by the applicable Party, then either Purchaser or the Company may, as appropriate and in accordance with this Section 15, commence an arbitration proceeding or, to the extent specifically provided for in Section 15(a), file a claim in court.

(d)    **Process.** Any Dispute shall be referred to and finally resolved by arbitration administered by the Singapore International Arbitration Centre ("SIAC") in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference in this clause. The seat of the arbitration shall be Singapore. The Tribunal shall consist of three (3) arbitrator(s). The language of the arbitration shall be English.

16.    **Miscellaneous.**

(a)    **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(b)    **Amendments.**  This Agreement may not be modified, amended, assigned, supplemented, or rescinded, or any provisions hereof waived, except by a new written agreement executed by both Company and Purchaser.

(c)    **Binding Agreement.** This Agreement provides the legally binding terms and conditions for the sale and purchase of the WTT Tokens. By purchasing the WTT Tokens, the Purchaser acknowledges its understanding of and acceptance of the terms and conditions of this Agreement. Purchaser making a purchase on behalf of the legal entity understands and accept this Agreement on behalf of that entity (to which refers to "Purchaser" shall also apply) and warrant that he/she is duly authorized to act on behalf of that legal entity.

(d)    **Successors and Assigns.**    Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.   The Company may assign any of its rights and obligations under this Agreement.   No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)    **Severability.** In the event any provision of this Agreement is found to be invalid, illegal, or unenforceable the remaining provisions of this Agreement shall nevertheless be binding upon Company and Purchaser with the same effect as thought the void and unenforceable part had been severed and deleted.

(f)    **Headings.** The article headings of this Agreement are included for the convenience only and shall not affect the construction or interpretation of this Agreement.

- 6 -

about:bla

Case 2:20-cv-00464-SAB    ECF No. 16    filed 06/11/21    PageID.135    Page 22 of 78

DocuSign Envelope ID: DFE6F5FE-BCD5-486F-B823-0C618E0BB042

17.    **Execution of Agreement.**

(a)    **Execution in Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deems an original, and all of which taken together shall constitute one and the same instrument.

(b)    **Electronic Signature.** This Agreement may be signed electronically via DocuSigned. An electronic signature placed on this Agreement by Purchaser shall be deemed original and valid.

Purchaser

Company

Name: Scott Glasscock

Signature: Scott Glasscock
—1E414F5DD4DE4CB...

6/1/2017

By: Michael Savuskan, CEO

Signature: Michael Savuskan
—AEA99F1E6370447...

6/1/2017

- 7 -

# EXHIBIT 4



Token Launch White Paper

May 2017

# Table of Contents

Legal Disclaimer.................................................................................... 3

Token Launch Summary...................................................................... 4

Overview of the Giga Watt Project...................................................... 5

    Substance of the Giga Watt Project............................................ 5

    Project History................................................................................ 6

    Giga Watt's Pricing........................................................................ 6

    Market Overview............................................................................ 8

    Giga Watt Technology.................................................................... 9

Token Launch Details............................................................................ 12

    Token Launch Overview................................................................. 12

    Token Launch Platform.................................................................. 16

    WTT Smart Contract....................................................................... 16

    Payment Terms............................................................................... 17

    Distribution and Rates................................................................... 19

Projected Timeline................................................................................. 20

Team......................................................................................................... 22

    Giga Watt Project Team................................................................ 22

    Cryptonomos Token Launch Team............................................. 23

Risk Factors............................................................................................. 25

134834324.1

# Legal Disclaimer

The purpose of this White Paper is to present the Giga Watt project to potential token holders in connection with the proposed Token Launch. The information set forth below may not be exhaustive and does not imply any elements of a contractual relationship. Its sole purpose is to provide relevant and reasonable information to potential token holders in order for them to determine whether to undertake a thorough analysis of the company with the intent of acquiring WTT tokens.

Nothing in this White Paper shall be deemed to constitute a prospectus of any sort or a solicitation for investment, nor does it in any way pertain to an offering or a solicitation of an offer to buy any securities in any jurisdiction. This document is not composed in accordance with, and is not subject to, laws or regulations of any jurisdiction which are designed to protect investors.

Certain statements, estimates and financial information contained in this White Paper constitute forward-looking statements or information. Such forward-looking statements or information involve known and unknown risks and uncertainties which may cause actual events or results to differ materially from the estimates or the results implied or expressed in such forward-looking statements.

This English language White Paper is the primary official source of information about the WTT Token Launch. The information contained herein may from time to time be translated into other languages or used in the course of written or verbal communications with existing and prospective customers, partners etc. In the course of such translation or communication some of the information contained herein may be lost, corrupted, or misrepresented. The accuracy of such alternative communications cannot be guaranteed. In the event of any conflicts or inconsistencies between such translations and communications and this official English language White Paper, the provisions of this English language original document shall prevail.

134834324.1

# Token Launch Summary

**WTT token** is an Ethereum token representing the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption.

**Token Launch** means the initial sale to the public of WTT tokens.

**Token Issue** means a release of a specific batch of WTT tokens.

Tokens will be offered for 60 days starting on June 2, 2017 and ending on July 31, 2017.

The offering will be open to the public globally.

| | |
|---|---|
| Token Sale Volume: | 30 million WTT |
| Token Issue Volume: | 34.5 million WTT [1] |
| Distribution of Tokens: | For every 100 tokens sold in this offering 15 additional tokens will be issued and retained for the team members, partners and advisors[2] |
| Token Price at Issue: | Equivalent of USD 1-1.2, depending on the date of the acquisition |
| Website link: | https://cryptonomos.com/wtt/ |
| Accepted forms of payment: | Bitcoin ("BTC"), Ether ("ETH"), wire transfer |
| Presale Start Date: | May 19, 2017, 12:00 PM PDT |
| Presale End Date: | June 2, 2017, 12:00 PM PDT |
| Token Launch Start Date: | June 2, 2017, 12:00 PM PDT |
| Token Launch End Date: | July 31, 2017, 12:00 PM PDT |
| Initial Token Issue Date: | August 7, 2017, 12:00PM PDT |

---

[1] The WTT tokens will only be issued based on actual existing facility capacity.  More WTT tokens will be issued as the facility capacity is increased through future build outs.
[2] See Section 'Distribution and Rates' for details.

4

# Overview of the Giga Watt Project

## Substance of the Giga Watt Project

The Giga Watt Project is built in partnership between Giga Watt, Inc. a U.S. company ("Giga Watt" or "Company"), which offers mining hosting services at its Wenatchee, WA facilities, and GigaWatt Pte. Ltd., a Singapore company ("Partner"), which sells mining equipment to customers worldwide.

Giga Watt is a full-service mining solution provider. Giga Watt offers turnkey mining services or custom packages tailored to clients' needs: full range of mining services from hosting, maintenance and repair to private blockchain servicing. The Partner offers equipment sales through Giga Watt's web site[3].

Giga Watt's standard turnkey solution includes purchase and delivery of mining equipment through its Partner with its subsequent setup and hosting at Giga Watt's facilities in Wenatchee, WA, with hosting fees starting as low as 7.5 USD cents/kW/hour[4], zero setup fees (for equipment purchased through its Partner) and uniquely low minimum facility entrance threshold of 1 miner of any model.

Giga Watt can host a wide range of mining equipment models commonly used by miners; many popular models are offered for sale by its Partner.

Giga Watt also offers a variety of custom packages and services, so that clients who own their mining equipment, including the models not distributed by Giga Watt's Partner, can still host it at Giga Watt's facility: Giga Watt can accommodate any ASIC or GPU-based miners[5].

Giga Watt mines all scalable cryptocurrencies. The decision on what currency to mine is made by the customers who own the mining equipment. However, at this stage it is technically impossible for Giga Watt to offer all available options to retail customers. Currently, retail customers can mine only BTC, ETH, and LTC[6].

Your choice of equipment also determines which mining pool you can use. The following three pools are available to Giga Watt's clients: Slush Pool to mine bitcoins, NanoPool for Ethereum and LitecoinPool for LTC[7].

---

[3] The sales and delivery of equipment is offered through the Partner's sales module on Giga Watt's web site .

[4] See details in Giga Watt's Pricing section below.

[5] ASIC-based miners are used to mine bitcoin or litecoin, GPU-based equipment is used to mine other altcoins.

[6] Giga Watt is working on expanding this list of currencies in the future.

[7] List of mining pools may be revised in the future.

5

134834324.1

A miner is a piece of equipment operating 24/7 under extremely high load, so failures and breakdowns are quite common. Miners have to be shipped to service centers for repairs, which takes time, especially if a service center is located abroad, and every day of downtime means a loss of mining profit. Giga Watt's on-site service center minimizes the downtime (93.5% minimum uptime), thereby achieving more efficient mining.

Although it is common practice in the industry not to disclose the details of mining facilities, including their locations, in order to preserve trade secrets and shut competitors out of inexpensive power locations, Giga Watt believes in complete transparency. Years of experience in the mining business demonstrate that running a competitive company takes more than the ability to copy. This is why every two weeks Giga Watt welcomes visitors to its Open House in Wenatchee to personally tour the mining facility.

## Project History

In 2010, a software engineer and 10-year veteran startup entrepreneur Dave Carlson first came across Bitcoin. He's been innovating in the space ever since. In 2012 he founded MegaBigPower with the goal of building the world's first megawatt-scale Bitcoin mining center and identifying the key design parameters required to successfully scale up the business of Blockchain transaction processing. Soon it became one of the largest single-operator mines in the world.

Now, MegaBigPower has re-branded as Giga Watt, which completed the construction of 3 mining facilities designed by the original MegaBigPower team and built under their supervision (250kW, 1MW and 1MW). The opportunity to use these facilities is now being offered for tokenization. All three facilities are in operation and mostly rented out (actual numbers are placed and updated regularly here - https://cryptonomos.com/wtt/#/capacity). Giga Watt continues to build new units with its own resources[8].

## Giga Watt's Pricing

Giga Watt's pricing structure for standard turnkey solution consists of a one-time charge for the purchase of miners and daily charges for hosting services, which include:
- effective electricity cost;
- maintenance fee; and

---

[8] See details in the Timeline Section. Tokens are issued only when new processing center capacity becomes available for the use of the token holders.

- facility rental fee.

**Miners Purchase:**

Four models of mining equipment[9] are currently available for purchase through Giga-Watt.com:

|  | ASIC miner S9 (PSU included) | ASIC miner T9 (PSU included) | ASIC miner L3+ (PSU included) | PandaMiner B3 Plus (PSU included) |
|---|---|---|---|---|
| Cryptocurrency mined | Bitcoin | Bitcoin | Litecoin | Ethereum |
| Hash Rate | 13,5TH/s | 12.5 TH/s | 504 MH/s | 237 MH/s |
| Power Consumption | 1,323W +10% | 1,576W +7% | 800W +10% | 1,250W + 10% |
| Chip | 16nm | 16nm | BM1485 | RX470 |

Current prices and specifications are regularly published and updated at https://giga-watt.com/promo/prices.

**Hosting fees[10]:**

|  | Small Starter up to 9 miners | Medium Self-Miner 10-49 miners | Large Small Facility 50-99 miners | X-Large Mining Farm 100 miners and more |
|---|---|---|---|---|
| **Hosting fee, hour** | ¢9.75 kW/h | ¢9 kW/h | ¢8.25 kW/h | ¢7.5 kW/h |
| Electricity | 2.80 | 2.80 | 2.80 | 2.80 |
| Maintenance | 0.50 | 0.50 | 0.50 | 0.50 |
| Facility rent | 6.45 | 5.70 | 4.95 | 4.20 |
| **Hosting fee, day** | ¢0.23 W/day | ¢0.22 W/day | ¢0.2 W/day | ¢0.18 W/day |
| Electricity | 0.067 | 0.067 | 0.067 | 0.067 |
| Maintenance | 0.012 | 0.012 | 0.012 | 0.012 |
| Facility rent | 0.155 | 0.137 | 0.119 | 0.101 |

---

[9] The list of models may be revised in the future. Equipment's description may be revised at any time to reflect the manufacturer's specifications.
[10] Hosting fees may be revised in the future.

7

Payments for hosting services (electricity, maintenance, rental fees) are deducted daily from the mining rewards. Giga Watt does not charge any fees for transfers and withdrawals of funds; however, third parties may charge fees to transfer funds or withdraw them from the account on Giga Watt's platform).

Clients who have their own mining equipment can host it at Giga Watt at the same hosting prices, with the only difference of paying the following setup fees: USD 20 per ASIC-based miner, USD 40 per GPU-based miner[11].

Giga Watt's service center also provides an add-on paid option of emergency equipment repairs. The cost of service depends on the nature of performed repairs.


## Market Overview

Generally, only four options exist on the market for cryptomining. These are: (i) to operate miners from home; (ii) to use cloud mining; (iii) to host your own miners at third-party hosting facilities; or (iiii) to build proprietary mining facilities. The first two options are intended for private party mining, and the latter two are designed for businesses. Now, however, through its low fees and extremely low minimum entrance threshold, Giga Watt is able to offer a fifth option: competitive services which could be used not only by the clients of hosting companies but also serve as an alternative to home mining, cloud mining and self-built facilities.

| | Min number of miners | Max number of miners | Electricity cost | Maintenance + rental fee | Min setup costs |
|---|---|---|---|---|---|
| Home mining | 1 | 5 | 9.4 ¢/kW on average | 0 ¢/kW | ₷ 0 |
| Cloud mining | 0.015 | 10,000 | 9.9 ¢/kW and up | | 30% |
| 3rd party hosting | 100 | 250 | 3.0 ¢/kW and up | 6.0 ¢/kW and up | ₷ 2,000 |
| Self-built farm | 5,000 | ∞ | 2.8 ¢/kW and up | 2.0 ¢/kW and up | ₷ 3,000,000 |
| **Giga Watt** | **1** | **70,000** | **2.8** ¢/kW | **4.7** ¢/kW and up | ₷ **0** |

---

[11] Setup fees may be revised in the future.

134834324.1

Aside from the numbers, home mining is both expensive and demanding: it requires the owner's constant attention, and miners are quite noisy, which many find objectionable. Cloud mining is extremely opaque: As a rule, users have no knowledge of their equipment's brand name, model number, serial number, power efficiency and consumption, breakdown of costs, mining pool name or even the location of the facility. Self-built farms require experts and full-fledged business operations, which is risky: any mistake may cost millions. Third-party hosting provides a viable alternative but there is currently a dire shortage of these services: the demand greatly exceeds the supply.

What's more, effective electricity cost offered by Giga Watt is currently among the lowest feasible, and even taken together with other fees it is still comparable to average electricity rates worldwide.



*Electricity rates worldwide (USD cents per kW/h)*

All of this makes Giga Watt's expansion extremely timely and relevant.

## Giga Watt Technology

In the past 4 years, Giga Watt's team built 5 air-cooled mining facilities. This experience gave them the expertise to select, build and employ the best technologies for mining. From their experience Dave Carlson and his team discovered that large monolithic processing centers are not optimal for mining.

9

134834324.1

⊖ Large monolithic facility

– Active cooling uses up to 33% of a facility's available power

– Demands immense mechanical equipment

– Cooling, backup power and switchgear systems increase project costs fivefold

⊕ Compact high-density facilities

+ Shortest air flow distance saves power and cools efficiently

+ Utilizes readily available electrical transformers and switchgear

+ Minimum costs and progressive revenue earning during construction

The latest technology embodying this knowledge at Giga Watt's facility in Wenatchee, WA is the proprietary Giga Pods solution which takes advantage of the mining hardware's extremely high power density, avoids active cooling consumption, and saves power for high-efficiency mining, thus minimizing costs in every aspect of mining operations. Giga Pods can accommodate any type of miners. This model will be the cornerstone of Giga Watt's expansion[12].

Giga Watt's distinctive infrastructure consists of numerous autonomous units. This approach offers flexibility in the processing center's design and record-fast expansion of its capacity. It also minimizes construction costs and allows to utilize first units while new units are being built.

The final Giga Pod model will be completed before the end of the Token Launch. Status of the construction can be checked here - https://cryptonomos.com/wtt/#/capacity.



---

[12] Actual dimensions, processing power and other characteristics may vary slightly.

134834324.1

10



*Size: 12'x48'*
*Independent fiber-optic Internet connection*

High-pressure fans constantly circulate fresh air through the pod. Filtered air intakes are positioned on one side, with exhaust fans on the other. Rain and snow "fallout area" provides cool shade at intake. Shade placement of transformers ensures higher efficiency and better longevity.

Single "mining wall" inside the pod ensures cool air circulation around miners. All heat-producing equipment is arranged next to exhaust fans.

Grass-covered campus reduces dust, cutting down on intake filters maintenance costs. Arrangement of Pods with exhaust fans facing each other ("hot aisle-cold aisle"), in-line with prevailing wind air currents, clears warm air efficiently. Network autonomy minimizes outage risks for the entire operation.

Minimum processing power of each Giga Pod is 750 kW. Processing power depends on the equipment each Pod is designed to accommodate. A Pod designed to accommodate bitcoin miners and GPUs[13] or only GPUs can have minimum processing power. A Pod designed to accommodate only bitcoin miners can house up to 1.75 MW, but requires more vents and heavier-duty inside wiring and equipment, which will proportionally increase the construction costs.

The choice of the required processing power is determined by the market demand. Giga Watt's team chooses the most suitable Pod outfit option based on the agreements with its current and potential customers and their equipment hosting needs.

---

[13] GPU is a graphics processing unit which can be used to mine Ethereum and certain other cryptocurrencies.

11

## Token Launch Details

### Token Launch Overview

Our goal is to offer the token holders access to both an exciting new world of technology and the cryptocurrency mining business. Generally, mining turnover is comprised of three components: (i) electricity cost; (ii) mining hosting cost; and (iii) mining net profits. Net profits can vary greatly depending on mining equipment, while costs are constant and predictable and consume the lion's share of the potential profits.



*This infographic is an example based on the calculations from April 28, 2017. The numbers may vary significantly due to the rate fluctuations, mining difficulty increase, and other factors.*

Under the existing partnership arrangements between Giga Watt and its Partner, the Partner is offered access to Giga Watt's facility at an unprecedentedly low hosting rate, which significantly increases mining rewards. Now, through the tokenization process, this low hosting rate can be passed to all token holders.

**Each Giga Watt Project Token (WTT)** represents the right to use the Giga Watt processing center's capacity, rent-free for 50 years, to accommodate 1 Watt's worth of mining equipment power consumption. So to provision and use your mining equipment rent-free, you will need to purchase the number of tokens equal to your equipment's power consumption:

|  | ASIC miner S9 (PSU included) | ASIC miner T9 (PSU included) | ASIC miner L3+ (PSU included) | PandaMiner B3 Plus (PSU included) |
|---|---|---|---|---|
| Power Consumption | 1,323W +10% | 1,576W +7% | 800W +10% | 1,250W + 10% |

Token owners can use this capacity to accommodate their own miners or to rent it out to other users. Essentially, this is access to professional mining – with an extraordinarily low

12

entrance threshold. In fact, it could be compared to membership in an elite private mining club.



Giga Watt's hosting fee typically consists of effective electricity cost, maintenance fee and rental fee. Token owners pay zero rent, which drastically reduces their ongoing costs: their hosting fee is comprised only of effective electricity cost and maintenance fee.

| Miners | Hosting Fee, cents/kW/h | | |
|---|---|---|---|
| | Standard | For WTT Holder | Saving |
| 100+ | 7.50 | 3.30 | 56.00% |
| 50-99 | 8.25 | 3.30 | 60.00% |
| 10-49 | 9.00 | 3.30 | 63.33% |
| 1-9 | 9.75 | 3.30 | 66.15% |

To be used, tokens should be deposited in the token holder's account with Partner placed on Giga Watt's website[14]. When token holders buy miners from the Partner through Giga Watt's website, miners available to them will be automatically displayed in their accounts and matched with their tokens. If at the time of token purchase a token holder already owns miners, they can be matched with tokens manually[15].

Token holders can also rent out their extra tokens if they have more tokens than they need to accommodate their miners.

---

[14] Token holders manage their tokens through the Partner's token holder account module on Giga Watt's web site.

[15] Please contact the support team for manual matching.

13

**Renting Tokens**

Token holders who are not personally interested in mining or have spare tokens can rent them out via the Partner's rental module on Giga Watt's web-site[16], choosing one of the rental fees set by Giga Watt. Token rental fees are the same as the Giga Watt's facility rental fees, which are 4.20, 4.95, 5.7 and 6.45 US cents/kW/h, depending on the number of miners hosted (see Section "Giga Watt's pricing"). It translates into daily rental income of ¢0.1-0.15 per token (¢37-57 per year).

To take advantage of this option, Giga Watt's clients who do not have their own tokens and token holders who need additional tokens or have spare tokens, place orders seeking or offering tokens for rent on the Partner's rental module on Giga Watt's website. Each order specifies the number of tokens, the rental fee which the token holder is looking to receive or which the client has to pay according to the applicable pricing plan. Token holders and clients can view the lists of these orders, sorted by their value to the viewer, and choose a suitable option or place their own order.

After the completion of the Token Launch, hosting of miners will only be available to retail clients through tokens. Consequently, the clients who do not own tokens will have to rent them from their owners. Customers who had their miners hosted with Giga Watt before the start of the Token Launch will continue to be served. Their hosting fees will cover the rental fees for token holders who rent out their tokens. However, after the end of their miners' lifecycle they will be able to host their new miners with Giga Watt only if at that time there are token holders willing to rent out sufficient number of tokens.

Rental fees are deducted from their mining rewards daily and paid to the token holder via a third party splitter. Giga Watt and Partner do not charge any fees for the use of the rental module; however, third parties may charge fees to transfer funds or to withdraw them from the token holder's account on Giga Watt's web-site.

There is currently a dire shortage of mining hosting services: the demand greatly exceeds the supply. Furthermore Giga Watt's pricing packages are suitable for technology companies,

---

[16] The matching of token holders' and Giga Watt's clients' orders for tokens offered or sought for rent is offered through the Partner's token rental module on Giga Watt's website.

134834324.1

mining farms, cloud-mining projects, and even individual miners. All of this makes Giga Watt extremely timely, relevant, and attractive to potential renters of tokens.

**Access to capacities**

WTT can be used **from the very first date of issue**. Giga Watt facility's unique design allows for record-fast expansion, and the first units can be operated while the new ones are still being built.

Each Watt of capacity of each unit in operation is an opportunity to accommodate miners of token holders. Each Watt of capacity which is already rented out to the client who has no tokens of his own is an opportunity to rent tokens out.

Currently, all three existing facilities are in operation and mostly rented out. Status of the construction and the capacity utilization can be checked here - https://cryptonomos.com/wtt/#/capacity.

First batch of tokens of 5,400,000 WTT (which represents 5.4 MW capacity of the units put into operation by the end of the Token Launch) will be issued immediately following the end of the Token Launch. New batches of tokens will be issued in step with the construction of new units. Tokens will be distributed on the first come, first served basis.

**Summary**

To sum up, the purchase of access to  a hosting capacity with a lower hosting rate allows you to significantly reduce the cost of your mining business, thereby increasing mining rewards, offers more flexibility and helps balance out the mining risks: hosting capacity can be rented out at any time, and rental income is much less affected by the cryptocurrency volatility. Additionally, Giga Watt facility has a 50-year lifecycle (compared to 2.5 years for miners, due to constant increase in mining difficulty) and is suitable for any Blockchain. If any significant changes occur in the mining world, Giga Watt capacities could alternatively be used to set up private Blockchains.

Expected lifespan of WTT tokens is 50 years. This term is based on the expected lifespan of the Giga Watt's facilities.

134834324.1

## Token Launch Platform

Token Launch is conducted through a groundbreaking Cryptonomos platform.

All payments for WTT tokens will be collected by Cryptonomos. Upon the completion of the Token Launch, on August 7, 2017, Cryptonomos will issue and distribute its initial batch of WTT tokens, with subsequent batch issues to follow upon the completion of new capacity construction. If a cap of 30,000,000 WTT tokens sold is reached before the scheduled end of the Token Launch, Cryptonomos at its own discretion may issue WTT tokens ahead of the specified date to provide access to the facilities built by that time.

## WTT Smart Contract

WTT is an Ethereum token. It complies with and extends ERC-20 - a de-facto standard and widely used token API. WTT Smart Contract guarantees:

**1. Transparency**

**1.1. Balance.** The information on the number of tokens held by any user is public.

**1.2. Transfers.** All information on transfers is public and can be traced back in time.

**2. Ownership**

**2.1 Scope.** Only Ethereum users and contracts can be token holders.

**2.2. Uniqueness.** Each token belongs to one user-owner. There are no shared tokens.

**2.3. Right to transfer.** A token can be transferred to another user only by the direct command of its owner or by the command of the receiver directly authorized by the owner. No token transfer may be initiated by another user.

**3. Token Supply**

**3.1. Exclusive issue.** Only one user, the contract owner, can issue tokens.

**4. Contract Management**

16

**4.1 Replacement.** The contract owner can relinquish the ownership in favor of any other Ethereum user or contract.

**4.2 Blockade.** The contract owner can stop or resume token transfers between token holders at any time.

**5. Miscellaneous**

**5.1 Recovery.** Any call to the contract which results in an error does not change the users' tokens or Ether balance, except for the gas spent on the transaction.

**5.2 Limits.** Maximum allowed tokens in circulation and may be set and are limited to.

Smart contract does not guarantee the following ("Uncertainty Provisions"):

**1. User validity.** An account with positive token balance may or may not be a real Ethereum user or contract and therefore may not have a private key. Tokens transferred to such users will likely be lost.

**2. Ether supply.** The contract prohibits most, but not all means by which Ether could be sent to it by users who are not contract owners.

We engage independent auditors prominent in the industry, who review the smart contract code line by line, checking for any security, incentivization or other concerns regarding the attack surface.

## Payment Terms

WTT tokens will be available for purchase on pre-sale starting on May 19, 2017 and during the Token Launch from June 2, 2017 to July 31, 2017, unless a cap of 30,000,000 WTT tokens sold is reached earlier.

134834324.1

WTT can be acquired with BTC, ETH or fiat currencies via Cryptonomos platform. Transfers can be made from any BTC or ETH wallet[17]. For transfers of USD 1,000 and over a wire transfer option is available[18].

Funds are credited to the participants' Cryptonomos accounts and could be used to acquire tokens. Each account will have three wallets (USD/BTC/ETH). The minimum Token Launch entry threshold is 1 WTT (equals to 1-1.2 USD, depending on the day of acquisition). The minimum entry threshold for the pre-sale is 10,000 WTT tokens (equivalent of 10,000 USD).

Cryptonomos accounts will be accessible several days before the start of the Token Launch (web-based or mobile access). Users may be offered an option to sign up and make transfers to their Cryptonomos accounts, but they will not be able to acquire WTT tokens until the start of the Token Launch unless they purchase WTT Token on pre-sale through the sales team. Accounts will be protected from unauthorized access by a two-factor authentication system.

All funds collected through the pre-sale and Token Launch will be deposited in escrow. Original payments made in BTC and ETH will be converted to USD at the rate effective at the time when the rights to WTT tokens were reserved.

The funds will be released from escrow in step with the completion of facilities.

Once the Token Launch is closed, no further WTT tokens could be acquired. On August 7, 2017 or earlier, as described above[19], the first batch of tokens will be issued to participants[20]. As soon as the tokens are issued, they may be transferred to the owner's account on Giga Watt's web-site and used to host miners or to be rented out.

Giga Watt account owners get their mining rewards and rental income in BTC, ETH, or LTC (rental income is calculated based on the current exchange rate of BTC, ETH, or LTC to USD). Funds can be moved from the token holder's account to any third party BTC/ETH/LTC wallet at any time.

---

[17] Cryptonomos does not charge any processing fees. Processing time and fees are determined by the payment processor. Token holders are responsible for paying all processing fees and financial charges imposed by the payment processor in connection with the payment.
[18] Please contact the support team for wire transfer instructions.
[19] See Section "Token Launch Platform" for details.
[20] Please see the Projected Timeline section for details of the token issue batches.

18

134834324.1

## Distribution and Rates

The Giga Watt facility layout is extremely flexible, which allows us to be flexible with the token sales.

There is no minimum amount: the first facilities have already been completed and the new units are currently being built. Consequently, the tokens can be issued for as low capacity as required. However, the total number of tokens available for sale as Giga Watt builds out additional capacities is capped at 30 million.

Each token represents 1 Watt's worth of the processing center's capacity. For every 100 tokens sold, 15 additional tokens will be issued and retained for the team, partners and advisors: 10 tokens to be distributed to team members, and 5 to be retained for distribution to partners and advisors at issuer's discretion. Consequently, for every 100 tokens sold, 115 Watts of processing center capacity is put into operation.

If the token sale is over-subscribed, meaning that there is more demand for WTT tokens than there is existing facility capacity, the capacity will be allocated to the WTT tokens in the order in which the WTT tokens were purchased. The over-subscribed proceeds will be placed into escrow until the requisite processing center capacity has been built out.[21]

WTT tokens retained for distribution to the team will be distributed only when no proceeds from over-subscribed tokens remain in escrow awaiting the completion of additional processing center capacity construction. WTT tokens retained for distribution to partners and advisors will be distributed on a case by case basis.

WTT initial rate depends on the day of acquisition:



---

[21] If the construction of the processing center capacity designed to accommodate additional WTT tokens is not completed in a reasonable amount of time, the relevant portion of these proceeds will be refunded to the WTT token purchasers. However, if Giga Watt discharged all its obligations in full, no refunds will be due to the WTT token purchasers.

134834324.1                                                      claim arising from sale or purchase of security of the debtor?

## Projected Timeline

The size of the Giga Watt facility depends on the amount of available funds. The Giga Watt project has sufficient commitments for land and electricity to build additional capacities to fulfil its obligations under this Token Launch.

**Projected Token Launch Timeline**

- May 19 – June 2, 2017: pre-sale

- June 2 – July 31, 2017: Token Launch book building

- August 7, 2017: First batch of tokens (5,400,000 WTT) issued to participants; if the cap is reached earlier, the first batch of WTT tokens may be issued ahead of the  schedule to provide access to the facilities built by the time of the issue (at Cryptonomos' discretion).

*New batches of tokens will be issued in step with the construction of new facilities.*[22]  *To ensure the advantage for the Token Launch participants, no listing will be placed on third party exchanges until all WTT tokens sold through the Token Launch are distributed.*

**Projected Construction Timeline**

3 units, 2.25 MW are available right now

- July 15, 2017: 1 Giga Pod completed, 0.75 MW

- August 1, 2017:  2 Giga Pods completed, 2.4MW

- August 15, 2017: Expansion of the unit, 0.9 MW

- September 1, 2017: 3 Giga Pods completed, 4.5 MW

- September 15, 2017: 9 Giga Pods completed, 15 MW

---

[22] Additional  WTT tokens may be sold to the public in the future as the facility capacity is increased through build outs.

134834324.1

- October 1, 2017: 3 Giga Pods completed, 4.5 MW

- November 15, 2017: 3 Giga Pods completed, 4.2 MW

## Team

### Giga Watt Project Team

- Dave Carlson

  CEO, Giga Watt, Inc.

Software engineer and entrepreneur. 4 years as a CEO and founder of MegaBigPower, one of the largest single-operator mining facilities in the world.

- Adam West

  VP Business Development, Director, Operator-Partner Program, Giga Watt, Inc.

10 years' experience in business development, management and marketing. Over the past year focused on Blockchain technologies, with the emphasis on industrial mining projects.

- Kyle Sidles

  CTO, Giga Watt, Inc.

Database design, programming, network infrastructure and application deployment. Successfully built and launched over 200 diverse software projects in USA, India, and China. Builds and runs large-scale Blockchain data centers since 2013.

- Jeffrey Field

  Lead Engineer, Giga Watt, Inc.

4 years' experience designing the physical infrastructure for mining facilities, network layouts, and cooling plans while managing technical crews for all aspects of installation and maintenance at the MegaBigPower facilities.

- Brian Armstrong

  Operations Supervisor, Giga Watt, Inc.

Service and maintenance of mining equipment, training new personnel, team supervision on assigned operational tasks, troubleshooting and repair of network systems. 8 years' experience in the U. S. Air Force as a security expert.

22

- Sinden Harum

Executive Manager, Giga Watt, Inc.

Day to day operational responsibility for staff, office administration, payroll, human resources, bookkeeping, accounting, core programs, special programs.

- Michael Savuskan

CEO, GigaWatt Pte. Ltd.

24 years' experience in product, technology, and business development, marketing, planning, and sales management. Sales and profit growth, new business launches, and domestic and international marketplace assessments.

- Hayden Gill

VP of Sales, GigaWatt Pte. Ltd.

13 years' experience in investment, marketing, and alternative currencies. From 2010 focuses on bitcoin and blockchain technologies. Founder of successful projects in peer-to-peer payment services and alternative currencies.


**Cryptonomos Token Launch Team**

- Nick Evdokimov, CEO

14 years' experience in developing high load online services. Founder of numerous Internet enterprises. 2 years in Blockchain development.

- Dmitry Khovratovich, Smart Contract Development

12 years' experience, with a focus on privacy and security of blockchain projects (Bitcoin, Ethereum), design and analysis of cryptographic schemes, and security software engineering. Security Researcher at the University of Luxembourg.

- Andrew Kuzenny, Head of IR

134834324.1

18 years' experience in investor relations, seeking and engaging partners, asset management. A recent Blockchain technologies enthusiast.

- Edward Khaptakhaev, Legal Counsel

12 years' experience in legal support of international and domestic companies engaged in energy generation, banking and IT/IP.

- Leonid Markin, Financial management

12 years' experience in finances and asset management. 5 years in finances in the high-tech engineering segment of the energy field. Fintech entrepreneur.

- Daria Generalova, Communications and PR

10 years in public communications. Diverse experience in marketing, from event management to marketing strategy development, with a focus on infrastructure companies. Joined blockchain industry last year.

- Anar Babaev, Digital Marketing

14 years in digital marketing. Internet entrepreneur focused on mastering and implementation of new technologies. Co-author of several books on digital advertising.

134834324.1

# Risk Factors

The acquisition of Tokens involves a high degree of risk, including but not limited to the risks described below. Before acquiring tokens, it is recommended that each participant carefully weighs all the information and risks detailed in this White Paper, and, specifically, the following risk factors.

**A. Dependence on computer infrastructure**

Giga Watt's dependence on functioning software applications, computer hardware and the Internet implies that Giga Watt can offer no assurances that a system failure would not adversely affect the performance of your mining operations. Despite Giga Watt's implementation of all reasonable network security measures, its processing center servers are vulnerable to computer viruses, physical or electronic break-ins or other disruptions of a similar nature. Computer viruses, break-ins or other disruptions caused by third parties may result in interruption, delay or suspension of services.

**B. Smart contract limitations**

Smart contract technology is still in its early stages of development, and its application is of experimental nature. This may carry significant operational, technological, regulatory, reputational and financial risks. Consequently, although the audit conducted by independent third party increases the level of security, reliability, and accuracy, this audit cannot serve as any form of warranty, including any expressed or implied warranty that the WTT Smart Contract is fit for purpose or that it contains no flaws, vulnerabilities or issues which could cause technical problems or the complete loss of WTT tokens.

**C. Regulatory risks**

The Blockchain technology, including but not limited to the issue of tokens, may be a new concept in some jurisdictions, which may then apply existing regulations or introduce new regulations regarding Blockchain technology-based applications, and such regulations may conflict with the current WTT Smart Contract setup. This may result in substantial modifications of the WTT Smart Contract, including but not limited to its termination and the loss of WTT tokens.

**D. Price of Bitcoin**

134834324.1

Giga Watt offers services to companies and individuals engaged in mining cryptocurrencies, primarily Bitcoin. Such operations are highly dependent on Bitcoin prices at local exchanges. Sharp and protracted decline in Bitcoin prices can affect the ability of Giga Watt's customers to fulfill their contractual obligations to pay rental fees to token holders whose tokens they rent.

**E. Rapid changes in technology may adversely affect mining business**

Cryptocurrency mining is a very dynamic and fast-paced business. To remain competitive, Giga Watt will use its best efforts to follow and promptly introduce the latest technologies at its facility. However, Giga Watt's failure to remain competitive despite its endeavors may pose the risk of declining benefits for the WTT token holders. Likewise, token holders are advised to monitor their own mining equipment performance and update it as needed. Alternatively, as their equipment performance weakens over time, they should consider renting their tokens out to other miners to avoid the decline in the mining rewards.

**F. Fluctuation in mining rewards.**

Mining cryptocurrencies is a risky business and many factors must be carefully considered prior to its commencement. Fluctuations of the BTC price, increase of the prices for mining equipment and electricity, growth of the mining difficulty rate, decrease in the block reward, and many other factors may affect mining rewards and result in losses.

**G. Fluctuation in token benefits and rental income.**

The WTT token is intended to provide a valuable benefit of access to a low-cost hosting solution for cryptocurrency miners by giving them the ability to use Giga Watt's facilities. Although token holders can rent their tokens to other people through the internal Giga Watt platform and receive income from rent, the primary purpose of the token is to allow token holders to achieve savings by cutting costs of their mining operations. Market changes, a drop in hosting prices, changes in the local cost of electricity at WTT's facility and other factors may reduce the value of the WTT tokens and drive down the rental prices of tokens.

**H. Construction delay.**

Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because

26

of many factors, including those beyond Giga Watt's control, such as the actions of third parties (contractors, suppliers, etc.). If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers.  The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**I. Change in electricity rate.**

The effective electricity rate provided in this document is based on a current cost of electricity available under the existing contracts with the Public Utility District of Washington State. The electricity rate is not guaranteed and may change from time to time. Any change in electricity rates will cause a direct change in the value of the WTT tokens and the ongoing cost of hosting your mining equipment.

**J. Irregular electricity consumption.**

If during the testing of the equipment sent to Giga Watt for hosting such equipment demonstrates a greater use of electric power than the number of WTT tokens purchased or rented to accommodate it, the equipment owner will be charged a regular Giga Watt's hosting rate (7.5-9.75 cents per kWh, depending on the number of hosted miners) for any amount of power consumed by the equipment in excess of the number of tokens available to host it.

**K. Change of electricity consumption.**

From time to time, the equipment's power consumption may fluctuate for various reasons including but not limited to seasonal temperature changes. If and when the equipment's power consumption exceeds the number of WTT tokens purchased or rented by its owner for its hosting, the owner will be charged a regular Giga Watt's hosting rate (7.5-9.75 cents per kWh, depending on the number of the hosted miners) for any amount of power consumed by the equipment in excess of the number of tokens available to host it.

**L. Change in maintenance cost.**

The maintenance cost specified in this document is based on the current labor costs and the hours required to run the company's operations and maintain the projected number of facilities and the clients' equipment. Over time, the cost of maintenance may change for

27

various reasons, including but not limited to the eventual minimum wage increase by the Washington State or Federal government. Any change in maintenance cost will cause a direct change in the value of the WTT tokens and the ongoing cost of hosting your mining equipment.

**M. Sales and other taxes.**

Token holders and purchasers of mining equipment may be required to pay sales tax (collected at sale) and other taxes associated with the transactions contemplated herein, whether in the United States or in their home countries. It will be a sole responsibility of the token holders and purchasers of the mining equipment to comply with the tax laws of the United States and other jurisdictions and pay all relevant taxes.

**N. Force Majeure.**

Giga Watt's performance may be interrupted, suspended or delayed due to force majeure circumstances. For the purposes of this White Paper, force majeure shall mean extraordinary events and circumstances which could not be prevented by Giga Watt and shall include: acts of nature, wars, armed conflicts, mass civil disorders, industrial actions, epidemics, lockouts, slowdowns, prolonged shortage or other failures of energy supplies or communication service, acts of municipal, state or federal governmental agencies, other circumstances beyond Giga Watt's control, which were not in existence at the time of Token Launch. If such circumstances occur prior to issuance of WTT tokens and Giga Watt is unable to issue WTT tokens within 6 months from the projected date, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.

**O. Compliance with U.S. laws and regulations.**

Because the hosting facilities are located in the United States, WTT token holders who wish to use their tokens to host their equipment at the facilities would be required to comply with the U.S. laws and regulations and may need to verify their identities and provide proof of address (for individuals), or verify their registration, good standing, list of ultimate beneficial owners, and address (for legal entities) prior to using their WTT tokens and setting up their equipment at Giga Watt's facilities, or at any time thereafter upon Giga Watt's request. Token holders who fail to comply with such verification request, or who are determined to be

28

restricted from dealing with the U.S. entities or operating in the U.S., or who are otherwise ineligible under the US law to host their equipment with Giga Watt would be refused hosting or WTT token rental services, with no refund issued by Giga Watt for the purchased tokens. Such token holders may retain their tokens or may, at their discretion, choose to sell them to eligible customers. Token purchasers are solely responsible for learning about the US laws and legal restrictions applicable to residents of certain countries and individuals involved in certain activities.

**P. Disclosure of information.**

Personal information received from WTT token holders, WTT token renters, and owners of the equipment submitted for hosting, the information about the number of tokens or miners serviced by Giga Watt, rewards earned on the pool, the wallet addresses used, and any other relevant information may be disclosed to law enforcement, government officials, and other third parties when Giga Watt is required to disclose such information by law, subpoena, or court order. Giga Watt shall at no time be held responsible for such information disclosure.

**Q. Value of WTT Token.**

Once purchased, the value of WTT Token may significantly fluctuate due to various reasons. Giga Watt does not guarantee any specific value of the WTT Token over any specific period of time. Giga Watt shall not be held responsible for any change in the value of WTT Token.

Assumptions with respect to the foregoing involve, among other things, judgments about the future economic, competitive and market conditions and business decisions, most of which are beyond the control of the Giga Watt project team and therefore difficult or impossible to accurately predict. Although the Giga Watt team believes that its assumptions underlying its forward-looking statements are reasonable, any of these may prove to be inaccurate. As a result, the Giga Watt team can offer no assurances that the forward-looking statements contained in this White Paper will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements contained herein, the inclusion of such information may not be interpreted as a warranty on the part of Giga Watt or any other entity that the objectives and plans of the Giga Watt project will be successfully achieved.

Please note that the Giga Watt project may be subject to other risks not foreseen by its management at this time.

134834324.1

# EXHIBIT 5

W**S**GR  **Wilson Sonsini Goodrich & Rosati**
P R O F E S S I O N A L   C O R P O R A T I O N

701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036

PHONE 206.883.2500
FAX 206.883.2699
**www.wsgr.com**

STEPHANIE L. JENSEN
sjensen@wsgr.com
Direct Dial: (206) 883-2556

August 2, 2018

**FOIA CONFIDENTIAL**
**TREATMENT REQUESTED**

*Via Email (mathieb@sec.gov)*

BeLinda I. Mathie
Senior Attorney, Division of Enforcement
U.S. Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

Re:    **In the Matter of Giga Watt, Inc. (MC-08502)**

Dear Ms. Mathie:

As you know, this firm represents Giga Watt, Inc. ("Giga Watt") in connection with the U.S. Securities and Exchange Commission's ("SEC") May 2, 2018 letter requesting a voluntary production of documents and information in the above-referenced matter. In this letter, we first provide written responses to certain Information and Documents to be Produced ("Requests") contained in your May 2, 2018 letter. Second, we write to follow up regarding certain information presented during our June 20, 2018 meeting. And finally, we provide responses to certain questions raised by the Staff during the June 20, 2018 meeting.

## I.    RESPONSES TO REQUESTS

**Request No. 1**:

A description of the corporate structure and management of Giga Watt, including, without limitation, the date and place of establishment, organization, and, if applicable, incorporation or formation.

Response to Request No. 1:

Giga Watt is a closely held corporation formed under the laws of the state of Washington on December 15, 2016. Certain of Giga Watt's corporate documents have now been produced.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 2

**FOIA CONFIDENTIAL**
**TREATMENT REQUESTED**

Giga Watt is managed by the following directors and officers:

| Individual | Position |
|---|---|
| David M. Carlson | Chief Executive Officer, Director |
| Timur Usmanov | Chief Financial Officer, Secretary |
| Andrey Kuzenny | Chief Operation Officer |

Giga Watt's current share ownership is as follows:

| Shareholder | No. of shares |
|---|---|
| David M. Carlson | 1,000 |
| Silaren Limited | 3,020 |
| Leonid Markin | 1,660 |
| Andrey Kuzenny | 1,660 |
| Eduard Khaptakhaev | 1,660 |
| The Goldcoin Trust | 500 |

Giga Watt believes this responds in full to Request No. 1. If you seek additional information, please let us know.

**Request No. 2**:

A list of all officers, directors, principals, owners, shareholders, employees, and all others acting on behalf of Giga Watt, including each person's title/role.

Response to Request No. 2:

In addition to the information provided in Response to Request No. 1, the requested information is attached hereto as Addendum A.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 3

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

Giga Watt believes this responds in full to Request No. 2.  If you seek additional information, please let us know.

**Request No. 3**:

A list of all domestic and foreign bank, brokerage, cryptocurrency, or other financial accounts held by or on behalf of or controlled by Giga Watt, including its owners, officers, employees and agents.

Response to Request No. 3:

Giga Watt currently holds the following accounts:

- Bank of America, Account No. 325104121544, Routing No. 122000661/121000358; and

- Washington Trust Bank, Account Nos. 1000622587, 1000624864, and 1000624930, Routing No. 125100089.

Giga Watt believes this responds in full to Request No. 3.  If you seek additional information, please let us know.

**Request No. 4**:

To the extent not covered by Request #3 above, a list of all cryptocurrency digital wallet addresses that were used to send assets to Giga Watt, including any virtual currency, or other token or coin, in connection with any digital token or coin, or any membership interest or asset, sold or contemplated to be sold by Giga Watt.

Response to Request No. 4:

No funds were paid to Giga Watt in cryptocurrency in connection with the token sale.  As we explained on June 20, 2018, Cryptonomos provided the platform for GigaWatt Pte. Ltd.'s ("GW Singapore") WTT token sale and was authorized by GW Singapore to collect the sales proceeds paid in cryptocurrency, convert it to fiat currency, and transfer it to the designated escrow account.

Conversely, Giga Watt received fiat currency either from GW Singapore directly, or from the escrow account at the direction of GW Singapore.

Giga Watt believes this responds in full to Request No. 4.  If you seek additional information, please let us know.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 4

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

**Request No. 5**:

To the extent not covered by Requests #3 and #4 above, a list of all cryptocurrency digital wallet addresses that were used to send assets to a third party to be transmitted to Giga Watt, including any virtual currency, or other token or coin, in connection with any digital token or coin, or any membership interest or asset, sold or contemplated to be sold by Giga Watt.

Response to Request No. 5:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens; they were sold through Cryptonomos' platform for the benefit of GW Singapore. However, the list of cryptocurrency digital wallet addresses used to purchase WTT is attached hereto as Addendum B.

Giga Watt believes this responds in full to Request No. 5.  If you seek additional information, please let us know.

**Request No. 6**:

A description of Giga Watt's operations, including without limitation any actual or contemplated products and services to be provided by Giga Watt.

Response to Request No. 6:

The most comprehensive description of Giga Watt's operations is set forth in the White Paper, which was produced at production number range GWSEC00000003–GWSEC00000031 on June 1, 2018.

At the time of the pre-sale and throughout the ICO, there were two large warehouses in East Wenatchee and one in Moses Lake, with a total of approximately 3 MW of capacity.  At present, total mining capacity (including temporary arrangements pending delivery of power to all constructed Giga Pods) is 22 MW, with 18 MW currently obligated by WTT holders.

Currently energized Giga Pods and other facilities, and the approximate dates they were energized, are set forth in the following chart.

| Energized Hosting Facilities | Approximate Dates Facilities Were Energized |
|---|---|
| Pre-existing Moses Lake facilities | Before pre-sale |
| Moses Lake Pods 1 and 2 | November 1, 2017 |

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 5

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

| | |
|---|---|
| Pangborn Pod 1 and Building A | November 13, 2017 |
| Moses Lake Pod 3 | December 20, 2017 |
| Moses Lake Pods 4 and 5 | January 3, 2018 |
| Ephrata temporary facility | January 7, 2018 |
| George temporary facility | February 1, 2018 |
| Moses Lake Pod 6 | February 6, 2018 |
| Moses Lake Pod 7 | February 17, 2018 |
| Moses Lake Pod 8 | April 25, 2018 |

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 7**:

A description of the purpose and utility (both actual and intended) of the Giga Watt token, including the rights and privileges held or contemplated to be held by purchasers or holders of Giga Watt tokens.

Response to Request No. 7:

The most comprehensive description of the purpose and utility of WTT tokens is set forth in the White Paper, which was produced at production number range GWSEC00000003– GWSEC00000031 on June 1, 2018. A WTT token represents the right to use Giga Watt's mining facility capacity rent free for 50 years, and entitles token holders to receive 1 Watt worth of mining equipment power consumption. This allows prospective miners of any size to participate in mining at the low energy rates available in Wenatchee, Washington while allowing them to save on the costs of running individual mining operations.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 6

**FOIA CONFIDENTIAL**
**TREATMENT REQUESTED**

request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 8**:

A list of all Persons that purchased any membership interest, token, or coin, offered by Giga Watt, including names and contact information (addresses, email addresses and telephone numbers).

Response to Request No. 8:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens; they were sold through Cryptonomos' platform for the benefit of GW Singapore. However, the requested list is attached hereto as Addendum C.

Giga Watt believes this responds in full to Request No. 8. If you seek additional information, please let us know.

**Request No. 9**:

Giga Watt's policies and procedures to verify the Accredited Investor status of purchasers of any Giga Watt token. Include a description of any such procedures actually followed during Giga Watt's presale and Giga Watt Initial Coin Offering ("ICO"), or other sales or grants of Giga Watt tokens.

Response to Request No. 9:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens. Giga Watt believes that it was not required to verify the Accredited Investor status of purchasers of WTT tokens, and it does not have any policies for doing so.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 10**:

Giga Watt's Know Your Customer ("KYC") policies and procedures.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission           **FOIA CONFIDENTIAL**
August 2, 2018                                    **TREATMENT REQUESTED**
Page 7

Response to Request No. 10:

Giga Watt believes that it was not required to adopt KYC policies and procedures, and it has not adopted any such policies or procedures.

Giga Watt believes this responds in full to Request No. 10.  If you seek additional information, please let us know.

**Request No. 11**:

A list of platforms, exchanges and/or secondary markets for actual or intended trading of Giga Watt digital tokens or coins.

Response to Request No. 11:

WTT is listed on the YoBit, ForkDelta (formerly EtherDelta), and Idex exchanges.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request.  Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email.  If you seek additional information, please let us know.

**Request No. 12**:

A description of any analysis by Giga Watt (or on its behalf) to determine whether any ICO or token sale or grant is a securities offering within the meaning of the U.S. federal securities laws, or regarding the application of the securities laws to Giga Watt's actual or contemplated ICOs, token sales, or grants.

Response to Request No. 12:

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request.  Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email.  If you seek additional information, please let us know.

**Request No. 13**:

All promotional and/or marketing materials presented or provided by Giga Watt to any actual or potential purchaser of any digital token or coin, any membership interest, or any asset

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission                    **FOIA CONFIDENTIAL**
August 2, 2018                                              **TREATMENT REQUESTED**
Page 8

sold or contemplated to be sold by Giga Watt, including without limitation any white paper, due
diligence materials, sales presentation, script, proposal, summary, highlights or talking points,
and any marketing Documents (including all pitch-books and pitch-decks), including all drafts or
prior version, and any copies bearing notations or marks not found in the original.

    Response to Request No. 13:

    Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include
documents concerning the subject of the initial request. Giga Watt believes it has produced all
non-privileged documents not containing foreign language that are responsive to this expanded
request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If
you seek additional information, please let us know.

    **Request No. 14**:

    All public statements by Giga Watt concerning Giga Watt, including without limitation
official statements, press releases, forum discussions, question and answers, and videos, issued
by Giga Watt including but not limited to Documents sufficient to identify the date and medium
of dissemination of any such statement.

    Response to Request No. 14:

    Giga Watt's counsel collected from publicly available internet sources public statements
by Giga Watt concerning Giga Watt as available on platforms Giga Watt identified as having
been utilized and through counsel's own search for news articles purporting to include public
statements by Giga Watt. These documents were produced on the following dates at the
following production number ranges.

- June 1, 2018—GWSEC00000032–GWSEC00016181;

- June 6, 2018—GWSEC00016182–GWSEC00020989; and

- June 29, 2018—GWSEC00021885–GWSEC00021926.

    Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include
documents concerning the subject of the initial request. Giga Watt believes it has produced all
non-privileged documents not containing foreign language that are responsive to this expanded
request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If
you seek additional information, please let us know.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 9

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

**Request No. 15**:

A description of any referral programs, incentive programs or promotional programs related to the actual or potential purchase of any digital token or coin, any membership interest, or any asset sold or contemplated to be sold by Giga Watt.

Response to Request No. 15:

As explained above in Response to Request No. 4, Giga Watt did not sell the WTT tokens; they were sold through Cryptonomos' platform for the benefit of GW Singapore.

Through the Cryptonomos platform, GW Singapore offered a 5% bonus to WTT purchasers who successfully referred the token sale to another. Cryptonomos posted the details of the referral program at the following URL:

https://bitcointalk.org/index.php?topic=1914900.msg19103130#msg19103130

Cryptonomos also announced a "bounty" program open to persons willing and able to translate the White Paper and other announcements into any of twenty-five listed languages. Cryptonomos posted the details of the bounty program at the following URL:

https://medium.com/cryptonomos/giga-watt-bounty-program-fe0f0bd498a6

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 16**:

Identify any threatened, pending, and settled litigation or arbitration concerning Giga Watt.

Response to Request No. 16:

On December 28, 2017, plaintiff StormsMedia, LLC filed a putative securities class action against Giga Watt and GW Singapore under the caption *StormsMedia, LLC v. Giga Watt, Inc. et al.*, No. 2:17-cv-00438-SMJ (E.D. Wash.). The complaint alleged claims of an unregistered offering of securities under sections 5(a) and (c) of the Securities Act of 1933 and of rescission of contract. Plaintiff and Giga Watt negotiated a settlement, pursuant to which the court dismissed the action on January 19, 2018.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 10

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

On March 19, 2018, plaintiff Mark Moss filed a securities action against Giga Watt and GW Singapore under the caption *Moss v. Giga Watt, Inc. et al.*, No. 2:18-cv-00100-SMJ (E.D. Wash.). The complaint alleges individual claims of an unregistered offering of securities under the Securities Act of 1933 and the Washington Securities Act and a claim for rescission of contract. By stipulation of the parties, on July 3, 2018, the court consolidated this case with an action titled *Balestra v. Giga Watt, Inc., et al.*, described below.

On March 20, 2018, plaintiff Raymond Balestra filed a putative securities class action against Giga Watt, GW Singapore, Cryptonomos, and Giga Watt CEO Dave Carlson under the caption *Balestra v. Giga Watt, Inc., et al.*, No. 2:18-cv-00103-SMJ (E.D. Wash.). The complaint alleges a claim of an unregistered offering of securities against all defendants under section 12(a)(1) and a control person claim against Dave Carlson under section 15(a) of the Securities Act of 1933 on behalf of a putative class of plaintiffs who purchased Giga Watt tokens during the Giga Watt ICO. On June 28, 2018, the court appointed Alex McVicker as lead plaintiff. By stipulation of the parties, on July 3, 2018, the court consolidated this case with the action titled *Moss v. Giga Watt, Inc. et al.* described above.

The above does not include any actions brought in small claims court by unsatisfied customers, or threats of litigation communicated by customers to support staff without the involvement of an attorney.

Giga Watt believes this responds in full to Request No. 16. If you seek additional information, please let us know.

**Request No. 17**:

All compensation Agreements between Giga Watt and any of its officers, directors, principals, owners, shareholders, employees, agents, general partners, or limited partners.

Response to Request No. 17:

Giga Watt has produced the employment agreements between Giga Watt, Inc. and David M. Carlson, and between Giga Watt, Inc. and Andrey Kuzenny.

To the best of our current knowledge, we believe these are the only formal compensation agreements entered into by Giga Watt. If additional compensation agreements are located, they will be provided to you.

Subject to the above caveat, Giga Watt believes this responds in full to Request No. 17. If you seek additional information, please let us know.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission                          **FOIA CONFIDENTIAL**
August 2, 2018                                                          **TREATMENT REQUESTED**
Page 11

**Request No. 18**:

Documents sufficient to show the amount, whether in fiat currency or cryptocurrency, raised in connection with the Giga Watt pre-sale and ICO.

Response to Request No. 18:

As explained above in Response to Request No. 4, Giga Watt did not conduct the pre-sale or ICO; these efforts were undertaken by Cryptonomos on behalf of GW Singapore. Total amounts raised during the pre-sale were 833.12983404 BTC, 3762.71675434 ETH, and $635,219.00 USD. Total amounts raised during the ICO were 3588.16195179405588140091 BTC, 21008.02428223565228806956 ETH, and $4,996,559.06 USD.

As discussed above, all cryptocurrency received in connection with the sale of WTT was converted to fiat and placed in escrow with Perkins Coie LLP.

The total revenue received as a result of the WTT token sale was $22,515,678.06, out of which $849,920.75 has been refunded to customers, leaving **$21,665,757.31**.

Giga Watt believes this responds in full to Request No. 18. If you seek additional information, please let us know.

**Request No. 19**:

Documents sufficient to identify any escrow Agreement or arrangement Concerning the proceeds of the Giga Watt pre-sale and ICO.

Response to Request No. 19:

As explained during our June 20, 2018 meeting, Perkins Coie LLP extended the use of its IOLTA account to GW Singapore to keep proceeds received from the WTT Token sale in escrow until WTT tokens were distributed to purchasers in step with construction of the respective hosting capacity. Perkins Coie LLP released the funds in accordance with the completion of construction of the Giga Pods and distribution of the WTT tokens in batches.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 12

**FOIA CONFIDENTIAL**
**TREATMENT REQUESTED**

**Request No. 20**:

Documents sufficient to show the use of the proceeds of the Giga Watt pre-sale and ICO.

Response to Request No. 20:

As stated in our July 13, 2018 email, all funds raised through the ICO were ultimately spent on construction.

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 21**:

Documents sufficient to show the actual and planned issuance of Giga Watt tokens, including the number of tokens and dates of issuance.

Response to Request No. 21:

The details of the planned issuance of WTT are included in the White Paper, produced at production number range GWSEC00000003–GWSEC00000031 on June 1, 2018. A total of 2,813,004 WTT were sold during the pre-sale. A net total of 20,154,783 WTT were sold during the ICO, comprised of the following:

2,813,004 (pre-sale) + 18,184,256 (ICO) – 842,477 (refunded) = 20,154,783 WTT

The number of tokens sold at each price point is as follows:

| Price | Tokens |
|---|---|
| $1.20 | 1,758,570 WTT |
| $1.15 | 3,293,194 WTT |
| $1.10 | 3,162,769 WTT |
| $1.05 | 3,652,050 WTT |
| $1.00 | 9,130,677 WTT |
| **TOTAL** | **20,997,260 WTT** |

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 13

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

The batches of tokens were issued as follows:

| Batch | WTT Issued | Date Issued |
|---|---|---|
| 1 | 5,045,779 | August 7, 2017 |
| 2 | 900,000 | August 15, 2017 |
| 3 | 4,500,000 | September 22, 2017 |
| 4 | 7,730,093 | December 25, 2017 |
| 5 | 4,090,869 | February 28, 2018 |
| 6 | 911,259 | February 28, 2018 |
| **TOTAL** | **23,178,000 WTT** | |

Per our call on June 13, 2018, you asked Giga Watt to broaden this request to include documents concerning the subject of the initial request. Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this expanded request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

**Request No. 22**:

Communications between Giga Watt and any of its affiliates, including but not limited to Cryptonomos and GigaWatt, Concerning the Giga Watt pre-sale and ICO.

Response to Request No. 22:

Giga Watt believes it has produced all non-privileged documents not containing foreign language that are responsive to this request from the initial data set of 4,096 documents as described in my June 11, 2018 email. If you seek additional information, please let us know.

\*       \*       \*

In summary, Giga Watt believes it has responded in full to Request Nos. 1–5, 8, 10, and 16–18 through the information contained in this letter, and has produced all non-privileged documents not containing foreign language that are responsive to Request Nos. 6, 7, 9, 11–15, and 19–22 from the initial data set of 4,096 documents as described in my June 11, 2018 email.

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 14

**FOIA CONFIDENTIAL
TREATMENT REQUESTED**

## II.    INFORMATION PRESENTED VERBALLY DURING JUNE 20, 2018 MEETING

To the extent not previously provided above, what follows relates to the information we presented during the June 20, 2018 meeting.

During the June 20, 2018 meeting, we stated that Anton Orlov is acting Chief Operations Officer ("COO") of Giga Watt, Inc.  This was incorrect.  Mr. Orlov is acting COO of GW Singapore, not Giga Watt, Inc.  Additionally, please note that Mr. Orlov's salary is not paid by GW Singapore, but rather by Credio Financial.

We also need to correct the statement that Giga Watt, Inc. is owned by Mr. Carlson (10%) and his partners, Mr. Markin, Mr. Kuzenny, and Mr. Khaptakhaev (30% each).  As set forth in Response to Request No. 1 above, while Mr. Carlson owns 1,000 shares (~10.5%) and Messrs. Markin, Kuzenny, and Khaptakhaev each own 1,660 shares (~17.5%), respectively, there are also two additional shareholders: Silaren Limited owns 3,020 shares (~31.8%) and The Goldcoin Trust owns 500 shares (~5.3%).

Additionally, during the June 20, 2018 meeting, we inadvertently provided inaccurate figures for the amounts of ETH and USD collected during the WTT pre-sale and ICO.  We stated that 833.12983404 ETH were raised during the pre-sale, which was the precise amount of BTC raised during the pre-sale.  We also stated that $692,897.00 USD was raised during the pre-sale and $5,094,227.55 USD was raised during the ICO.  As accurately stated in response to Request No. 18 above, the pre-sale raised 833.12983404 BTC, 3762.71675434 ETH, and $635,219.00 USD, and the ICO raised 3588.16195179405588140091 BTC, 21008.02428223565228806956 ETH, and $4,996,559.06 USD.  Please note that the figures we provided on June 20, 2018 for both the total amount of ETH raised during the entire ICO (21008.02428223565228806956) and the total amount of revenue raised as a result of the WTT token sale ($21,665,757.31) were accurate.

During the June 20, 2018 meeting, we noted that the marketing and promotion of WTT during the pre-sale and ICO was handled primarily by Cryptonomos and included the White Paper, websites, Bitcointalk, Telegram, Whatsapp, Slack, Twitter, Facebook, and Instagram. The specific URLs are provided below.

Promotion:
- https://bitcointalk.org/index.php?topic=1914900.0
- https://wtt.cryptonomos.com/

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission                    **FOIA CONFIDENTIAL**
August 2, 2018                                             **TREATMENT REQUESTED**
Page 15

<u>Official Links for Token Buyers</u>:
- Token Launch Website: https://cryptonomos.com/wtt/
- Twitter: https://twitter.com/WTTtoken
- Facebook: https://www.facebook.com/cryptonomos
- Telegram chat: https://t.me/wtt_token
- Instagram: https://www.instagram.com/cryptonomos
- Medium: https://medium.com/cryptonomos

<u>Official Links for Giga Watt's Clients</u>:
- Giga Watt Website: https://giga-watt.com/
- Facebook: https://www.facebook.com/gigawattcom
- Instagram: https://instagram.com/gigawatt_mining
- Twitter: https://twitter.com/gigawatt_mining
- Slack (support): https://slack.giga-watt.com/
- Blog: https://medium.com/gigawatt

Finally, you asked who provided legal advice regarding the pre-sale and ICO.  As we stated on June 20, 2018, representation was provided by three firms:  Blockchain Law Group PC (Katrina (Grant) Arden); Perkins Coie LLP (J. Dax Hansen and Lowell Ness); and Clyde & Co. Clasis Singapore Pte. Ltd. (Kai Young Tan).

## III.    RESPONSES TO QUESTIONS RAISED DURING JUNE 20, 2018 MEETING

During the June 20, 2018 meeting, we showed you three publicly available YouTube videos to help you picture Giga Watt's operations.  You requested the date each such video was released.  Below, we list the URL, name, duration, and date of release of each of these three videos.

1. https://youtu.be/_VYksAS2N1k
   Intro to Giga Pod
   6:17
   June 13, 2017

2. https://youtu.be/Tlhk3FwJaEc
   Giga Pod up close
   9:23
   July 21, 2017

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission
August 2, 2018
Page 16

<div align="right">FOIA CONFIDENTIAL
TREATMENT REQUESTED</div>

    3.   https://youtu.be/qpE2FqlgKG4
         Giga Watt's super high density racks
         2:09
         July 24, 2017

You also asked whether the facility shown in the first two videos above was Pod 1. We confirmed that it is.

You asked where the White Paper discloses that GW Singapore is the entity conducting the WTT token sale. The White Paper does not directly identify the entity issuing the WTT tokens. However, Page 12 of the White Paper explains that "[u]nder the existing partnership arrangements between Giga Watt and its Partner [previously defined as GW Singapore], the Partner is offered access to Giga Watt's facility at an unprecedentedly low hosting rate . . . . Now, through the tokenization process, this low hosting rate can be passed to all token holders." This language discloses the fact that GW Singapore is the entity that has negotiated for the low hosting rate, and is passing that low hosting rate along through tokenization to WTT token holders.

Regarding the escrow account, you asked who at Perkins Coie was responsible for withdrawals. Perkins Coie Partner Lowell Ness approved the release of funds from the IOLTA account, while Trust Accountant Billy Gajdos administered the funds transfers.

With respect to conversion, Cryptonomos converted cryptocurrency to fiat currency in batches throughout and immediately after the token sale through Circle Internet Financial Ltd., as set forth in the following table:

| Date | Fiat Amount |
|------|-------------|
| July 7 ,2017 | $780,000 |
| July 18, 2017 | $826,020 |
| July 21, 2017 | $1,287,500 |
| July 24, 2017 | $2,575,000 |
| July 28, 2017 | $95,000 |
| August 4, 2017 | $6,598,900 |
| August 4, 2017 | $5,000,000 |

WSGR000034

Wilson Sonsini Goodrich & Rosati
PROFESSIONAL CORPORATION

U.S. Securities and Exchange Commission                    **FOIA CONFIDENTIAL**
August 2, 2018                                              **TREATMENT REQUESTED**
Page 17


Finally, you asked us to provide an estimate of documents remaining to be reviewed.  To date, with the exception of 360 documents containing foreign language, we have completed the review of the documents returned from our initial search.  We sent the final production of non-foreign language documents on Wednesday, August 1, 2018, and anticipate providing you with logs of documents withheld or redacted on the grounds of privilege or privacy by August 15, 2018.

We believe this answers each of the questions you posed during the June 20, 2018 interview.  We are in the process of preparing responses to the inquiries you sent on July 30, 2018.  If you believe any other questions remain outstanding, or you believe additional document searches and review need to be conducted, please let us know.

\*        \*        \*

Please note that, through this letter and addendums, Giga Watt does not intend to produce privileged documents, provide privileged information, or waive any applicable privilege or work product protection.  Any inadvertent production or provision of such information is protected by Rule 502 of the Federal Rules of Evidence.  On behalf of Giga Watt, we request that the SEC provide confidential and nonpublic treatment, pursuant to the Freedom of Information Act ("FOIA"), to this letter, the enclosed documents and all information contained therein.  *See* 5 U.S.C. § 552(b); 18 U.S.C. § 1905; 17 C.F.R. § 200.80(b); 17 C.F.R. § 200.83; Letter to FOIA Officer (attached).

If you have any questions concerning this production, please feel free to contact me at (206) 883-2556.


Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


Stephanie L. Jensen

Stephanie L. Jensen


Enclosures

cc:    FOIA Officer (without enclosures)

# EXHIBIT 6

**CLAIM #365        FILED 2/19/2019**

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1   GIGA WATT INC | |
| Debtor 2 | |
| (Spouse, if filing) | |
| United States Bankruptcy Court    EASTERN DISTRICT OF WASHINGTON | |
| Case number:  18−03197 | |

FILED

U.S. Bankruptcy Court
**EASTERN DISTRICT OF WASHINGTON**

2/19/2019

Beverly A. Benka, Clerk

## Official Form 410
## Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:  Identify the Claim

| 1.Who is the current creditor? | Gigawatt Pte Ltd. |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2.Has this claim been acquired from someone else? | ☑ No |
|---|---|
| | ☐ Yes. From whom? |

| 3.Where should notices and payments to the creditor be sent?  Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent? (if different)** |
|---|---|---|
| | Gigawatt Pte Ltd. | |
| | Name | Name |
| | 1 Coleman Street The Adelphi #08−07 Singapore 179803 | |
| | Contact phone _____ +79257966852 _____ | Contact phone _____ |
| | Contact email _____ moon_mist@mail.ru _____ | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4.Does this claim amend one already filed? | ☑ No |
|---|---|
| | ☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____  MM / DD / YYYY |

| 5.Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|
| | ☐ Yes. Who made the earlier filing? _____ |

Official Form 410                        Proof of Claim                                page 1

**CLAIM #365        FILED 2/19/2019**

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6.Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7.How much is the claim?**

$ 26887859.79

**Does this amount include interest or other charges?**
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Loans
_____

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.
  **Nature of property:**
  ☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*
  ☐ Motor vehicle
  ☐ Other. Describe: _____

  **Basis for perfection:** _____

  Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

  **Value of property:**        $ _____

  **Amount of the claim that is secured:**   $ _____

  **Amount of the claim that is unsecured:**   $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

  **Amount necessary to cure any default as of the date of the petition:**   $ _____

  **Annual Interest Rate** (when case was filed)   _____ %

  ☐ Fixed
  ☐ Variable

**10.Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

**11.Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410                    Proof of Claim                    page 2

**CLAIM #365      FILED 2/19/2019**

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ _____ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.<br>18 U.S.C. §§ 152, 157 and 3571. | Check the appropriate box:<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct. |
|---|---|

Executed on date      2/19/2019
                                         MM / DD / YYYY

/s/ Marina Mikhaylyuta
Signature

Print the name of the person who is completing and signing this claim:

Name          Marina Mikhaylyuta

                    First name    Middle name    Last name

Title           Director

Company      Gigawatt Pte Ltd.

                    Identify the corporate servicer as the company if the authorized agent is a servicer

Address       1 Coleman Street, The Adelphi #08-07
                    Number  Street
                    Singapore 179803,
                    City  State  ZIP Code

Contact phone    +79257966852        Email    moon_mist@mail.ru

---

Official Form 410                          Proof of Claim                          page 3

**CLAIM #365          FILED 2/19/2019**

10:52 PM

02/17/19

Accrual Basis

**GIGA WATT, INC.**
**Balance Sheet**
As of June 30, 2018

|  | Jun 30, 18 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **1000.00 · Cash** | |
| 1000.20 · Petty Cash | 1,000.00 |
| 1010.00 · Bof A -CH-1544 | 2,998.61 |
| 1010.10 · BofA -CH-1573 | 100.00 |
| 1010.20 · BofA -SV-1609 | 0.31 |
| 1010.30 · Wa Trust 2587 | 89,215.71 |
| 1010.40 · Wa Trust 4930 | 57,812.39 |
| 1010.50 · Wa Trust 4864 | 12,398.39 |
| **Total 1000.00 · Cash** | 163,525.41 |
| **Total Checking/Savings** | 163,525.41 |
| **Accounts Receivable** | |
| 1200.00 · Accounts Receivable | 1,411,118.15 |
| **Total Accounts Receivable** | 1,411,118.15 |
| **Other Current Assets** | |
| 1201.00 · Undeposited Funds | -1,169,225.27 |
| 1350.00 · Prepaid Expenses | 100,000.00 |
| **1800.0 · Advances** | |
| 1800.10 · Employee Advances | 9,866.56 |
| **Total 1800.0 · Advances** | 9,866.56 |
| **1900.00 · Deposits Receivalbe** | |
| 1900.10 · TNT Deposit Bldg A | 45,373.00 |
| 1900.20 · Douglas County | 451,908.44 |
| 1900.30 · Ryan Oster | 80,000.00 |
| **Total 1900.00 · Deposits Receivalbe** | 577,281.44 |
| **Total Other Current Assets** | -482,077.27 |
| **Total Current Assets** | 1,092,566.29 |
| **Fixed Assets** | |
| **1100.00 · Fixed Assets** | |
| 1100.10 · Furniture and Fixtures | 61,190.14 |
| 1100.20 · Computer & Office Equipment | 118,351.49 |
| 1100.30 · Mining Equipment | 6,400.00 |
| 1100.50 · Accumulated Depreciation | -57,081.26 |
| **Total 1100.00 · Fixed Assets** | 128,860.37 |
| **1150.00 · Property Plant & Equipment** | |
| 1150.40 · Power Infrast. Improvement | 5,000.00 |
| **Total 1150.00 · Property Plant & Equipment** | 5,000.00 |
| **1160.00 · Data Centers** | |
| 1160.10 · Pangborn VD1 | 465,355.78 |
| 1160.20 · Moses Lake # 2-8 | 4,842,000.00 |
| 1160.3 · Moses Lake # 1 | 905,446.00 |
| 1160.40 · Other Locations Construction | 19,157,508.47 |
| **Total 1160.00 · Data Centers** | 25,370,310.25 |

**Page 1**

## CLAIM #365        FILED 2/19/2019

10:52 PM

02/17/19

Accrual Basis

### GIGA WATT, INC.
### Balance Sheet
### As of June 30, 2018

| | Jun 30, 18 |
|---|---|
| **1190.00 · Intangible Assets** | |
| 1190.10 · Goodwill | 531,500.00 |
| 1190.20 · Software & License | 24,000.00 |
| 1190.30 · Accumulated Amortization | -973.15 |
| **Total 1190.00 · Intangible Assets** | 554,526.85 |
| **Total Fixed Assets** | 26,058,697.47 |
| **TOTAL ASSETS** | 27,151,263.76 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000.00 · Accounts Payable | 2,479,054.13 |
| **Total Accounts Payable** | 2,479,054.13 |
| **Other Current Liabilities** | |
| 2250.00 · Enterprise Focus, Inc. | 1,000,000.00 |
| **2400.00 · Accrued Expenses** | |
| 2400.10 · Interest SingTrade | 97,440.70 |
| 2400.20 · Interest Cryptonomus | 178,285.24 |
| 2400.30 · Interest Giga Watt Pte | 201,319.01 |
| 2400.40 · Interest Enterprise Focus, Inc. | 179,349.03 |
| **Total 2400.00 · Accrued Expenses** | 656,393.98 |
| 2700.00 · Customer Deposits | 30,000.00 |
| **Total Other Current Liabilities** | 1,686,393.98 |
| **Total Current Liabilities** | 4,165,448.11 |
| **Long Term Liabilities** | |
| **2300.00 · Long Term Liabilities** | |
| 2300.10 · SingTrade Inc. | 1,917,153.15 |
| 2300.30 · Cryptonomos | 2,667,600.00 |
| 2300.40 · Gigawatt PTE. LTD (Singapore) | 26,686,540.78 |
| **Total 2300.00 · Long Term Liabilities** | 31,271,293.93 |
| **Total Long Term Liabilities** | 31,271,293.93 |
| **Total Liabilities** | 35,436,742.04 |
| **Equity** | |
| 32000 · Retained Earnings | -3,494,226.34 |
| Net Income | -4,791,251.94 |
| **Total Equity** | -8,285,478.28 |
| **TOTAL LIABILITIES & EQUITY** | 27,151,263.76 |

**Page 2**

# EXHIBIT 7



# CERTIFICATE CONFIRMING INCORPORATION OF COMPANY

**Company Name** : **GIGAWATT PTE. LTD.**

**UEN** : **201635028N**

This is to confirm that the company was incorporated under the Companies Act, on and from **28/12/2016** and that the company is a **EXEMPT PRIVATE COMPANY LIMITED BY SHARES**.



TAN YONG TAT
ASST REGISTRAR OF COMPANIES & BUSINESS NAMES
ACCOUNTING AND CORPORATE REGULATORY AUTHORITY
SINGAPORE

Dated : 03/01/2017
Receipt Number : ACRA170103101459



Authentication No. : I170001873

FOIA Confidential Treatment Requested

GWSEC00022356